We're ready for the first case, BRC Rubber & Plastics versus Continental Carbon. You're reserving five minutes for rebuttal. Is that correct? That's correct, Your Honor. Okay, you may proceed. Thank you, Your Honor. Good morning, and may it please the court. I'm quite sure that no one, parties included, likes to see three appeals in the same case. And for that matter, no one would leave the house in the span of the same case. But at the same time, I would say that this time around, the issues are a little different. And we also have a trial court record to rely on. Having said that, I think this trial was a little unusual, in the sense that there really weren't any material disputed issues. Most of the evidence came from BRC's own executives, including its president and owner, Mr. Chaffee. And really, the rest comes from documents, emails exchanged between the parties. So under those circumstances, while it's clear that we're under a clear error standard of review, I think the whole record is fair game for analysis without any kind of winnowing for credibility determinations and things like that. So as the court knows, this dispute came to a head in a brief period of time, over just a couple of months, in which there was a market shortage of this product called Carbon Black. And what that shortage did was expose a fault line in how the parties interpreted the volume obligation in their contract. Continental viewed the volume obligation as 1.8 million pounds or 150,000 pounds per month. But BRC believed that Continental had to supply all of its requirements. And this discrepancy in the beliefs, more than anything, drove the party's decision making. In fact, there was testimony from Mr. Chaffee that when he learned Continental was going to supply only 1.8 million pounds, that quote, were not covered. And of course, Continental turned out to be right in its interpretation of the contract. Another key fact that I just want to mention, and that's sometimes lost in the shuffle of this case, is that while the trial court ended up imposing three years of contract damages, during the entire period of this conflict between the parties, only one purchase order was actually at issue. Leading up to that point, Continental was way ahead of its annual obligation. And the purchase order was issued in April. It was for a rather whopping amount, it was for 360,000 pounds, even though the monthly requirement was only 150,000 pounds. Another thing about that purchase order is that when BRC terminated the agreement, it was actually partially fulfilled. Continental supplied a third of that purchase order on May 25th, about a week before the contract was terminated. And it also promised to fulfill another third, so two thirds total of that only purchase order in early June. And if Continental had actually fulfilled that entire purchase order as requested, it would have supplied 90% of the annual requirement for BRC within the first five months of the year. So again, way ahead of schedule. Getting to the legal issues, from my perspective, the overarching legal issue and the key to looking at this case is Indiana's standard for repudiation. Under Indiana law, it's very clear that the alleged repudiation must be positive, absolute, and unconditional. And importantly, that standard applies to claims that adequate assurance was not provided, and it also applies to claims of repudiation more generally. And if you pause and think about each one of those words, positive, absolute, unconditional, they set a very high bar. In essence, the repudiation to be actionable has to be definitive. There has to be clarity of intent. Mixed messages are not enough. Equivocations are not enough. Schizophrenic behavior is not enough. And yet, those are the types of characterizations that BRC has used throughout this case to describe what Continental did. Another important point is that Indiana courts have stressed that this standard of positive, absolute, unconditional repudiation is a strict standard, because the remedy, frankly, is a harsh one, or at least it can be. And what I understand to be a strict standard is a standard that a court should not stretch to meet. And I think that's what happened here. So, logically... Mr. Australia? Yes. First of all, do you agree that at least you're not challenging the district court's findings regarding BRC's reasonable grounds for insecurity? That's correct, Your Honor. So, we should look at this through the lens of Section 2609 of the UCC, right? I think that's right, Your Honor. So, I guess the legal question for me is, when your client's lawyer sends his May 20th message, Mr. Gutschall's letter, obviously that's a great fact for you. In isolation, it looks like at least verbal assurance has been given. Yes, we will honor the contract, but your defense seems to be built on the notion that, at least on appeal, that that message basically erases everything that came before and that any new grounds for insecurity, like the June price list that came out just a few days later, in essence starts... that history is erased and the situation starts anew. Is that right? I think it's partially right, Your Honor. Here's how I would frame it. I would say that the things that happened before the provision of adequate assurance can't also be double counted as failing to provide adequate assurance because really Continental was under no obligation to provide adequate assurance until it was asked and until it was asked in that matter. So, in that sense, the things that happened before would be erased, so to speak. I also would... Hard to forget them and where I'm going with this, in essence, is that as I understand, you've said, I think correctly, that a lot of the facts here, not all of them, but a lot of the facts are not really disputed, but the ultimate legal standard here is one of commercial reasonability under 2609, at least the way I understand the law, and by commercial standards rather than legal standards, and that sounds like a pretty case-specific, industry-specific, party-specific kind of decision where I would be inclined, I think, to treat that as just an overall question of reasonableness where a trier of fact would get a lot of deference. What's wrong with that analysis? Well, I think the main thing, Your Honor, is that we have to look at this positive, absolute, unconditional standard as an overlay, and by the way, that's a standard that BRC has agreed to in its statement of the issues in this case. That standard, according to the comment of 2609, is engrafted onto the analysis there because the Indiana comment to 2609 says that basically the analysis for adequate assurance can't conflict with the analysis under 2610, which is the general repudiation standard, and of course that standard is one of positive, absolute, and unconditional. So in my mind, yes, there's an element of commercial reasonableness to this, but you cannot simply ignore all the evidence contrary to the proposition that adequate assurance wasn't provided. Otherwise, in other words, you have to look at the context. The context is the only way to determine whether the alleged failure to provide adequate assurance was in fact positive, absolute, and unconditional, and as the Court is aware, we've outlined several things that happened around this time that Mr. Gutschall sent his email, and by the way, that email was all the way to that moment. I'm reminded of the, you know, the, I don't know, kind of stories in movies where somebody is getting orders from headquarters he doesn't like while on a mission and responds, acknowledge, yes, repeat, no. That is, you get this contradictory, if you look at that in isolation, sure, it's assuring, but if I expand the window to a week or so, I don't know why a judge couldn't say, well, that's really not reasonable assurance. Well, let me suggest this, Your Honor. Let's look exactly at what happened after that May 20th email from Mr. Gutschall. First, as I noted, it was satisfactory to BRC. Over the ensuing days, what happened was Mr. Mosia repeatedly said, we are going to provide you, we intend to provide you, we will do our best to provide you with 1.8 million pounds, and that was actually understood by BRC to mean they are going to do it. The problem for BRC was 1.8 million pounds wasn't enough. They needed much more than that. So that entire exchange of emails by Mr. Mosia and BRC after May 20th actually supports our position because he is basically taking the position we are going to imply, I'm sorry, we are going to comply with the contract. Well, that's, I mean, there's also evidence from that that he was saying, in essence, we'll do our best, right, which is, under the circumstances, might be understood as a little less comforting, and then we get the May 28th message with the June price sheet, right, where I'm sorry, well, where your client, in essence, just repeats exactly what we said. I'm happy to acknowledge that there are plenty of facts that favor you and your client's perspective on this case. That's why this case wound up being tried. But what do you do with the price increase and the interpretation of we'll do our best to say, well, but we don't know. On the do our best situation, your honor, there is testimony in the record that BRC and its executives actually understood that what that meant was the Continental was going to supply 1.8 million pounds. There was no doubt about it. The issue was it wasn't enough. So this retrospective characterization of do our best is introducing some doubt. It's really not consistent with the record evidence of what BRC actually understood at the time, okay. And I'm sorry, there was one other fact I wanted to include in this, which was that on May 20th, the same day Gutschall sent his assurance, Mocio was telling BRC to call another supplier, right. That occurred before Mr. Mocio, I'm sorry, Mr. Gutschall provided the adequate assurance, okay, just to be clear on the time frame of that. And it did relate to this issue of an order of N762, which they were trying to figure out whether they could cover or not, okay. So the key fact though there is that Mr. Gutschall comes in and sort of like the adult in the room, the lawyer, and says, listen, we're confirming. We're going to perform. And that really should have taken care of the issue or at least certainly under this standard of positive, absolute, unconditional repudiation was enough to provide more context on the other side of the equation, okay. On the issue of the price sheet, that's the worst fact for us, frankly, because that's about the only thing that happened after Mr. Gutschall issued the adequate assurance that cuts against our position, okay. Remember, in the meantime, Continental shipped orders and BRC accepted an order. And again, if a company isn't accepting an order under a contract, they cannot reasonably argue that they consider the contract to be repudiated at that point. In addition to actually shipping an order, Continental said another one's on the way in a week or so. Continental's rep also said contact me any time about order status. I'm here. So all those actions are consistent with Continental not repudiating the agreement moving forward. Counsel, you're in your five minutes rebuttal time. If I could just ask a quick question about the issue of mitigation of injunction. I haven't raised that argument, your honor. I think the... It was raised in the district court, right? That's right. Not here. Okay, good. It's not a good argument. So thank you. So just to clean up the issue of the price increase since it was asked about. It's true. Continental did seek a price increase of two cents a pound that was outside the contract. But it's also true that Mr. Chaffee, BRC's president, considered that price increase to be peanuts. He considered it to be something that... Right. That's... You've made that point repeatedly in your briefs and it... I'm wondering if it's unreasonable though for somebody on the other side of a contract to say, well that's like my contracting partner says we only tried to steal a little bit. But I don't trust them anymore. I see your point there, your honor. But the fact is these two parties negotiated an extra contractual tweak just a month or two earlier on payment terms and they came up with a win-win. And that's actually what Mr. Chaffee was thinking about doing with this request for the price increase was to get more volume out of the deal to somehow make it work. And the testimony was that's not an unprecedented thing to do. It happens in the land of commercial dealings. And it really wasn't material to BRC's decision making. It was all about the way it was presented. In other words, Mr. Chaffee said if he would have come in, if he would have asked professionally, if he would have been nice, if he would have had the right attitude, no problem. It's the way it was asked for that was a problem. If there's no other questions, I think I'll reserve the rest for rebuttal. Thank you, Mr. Elliott. Thank you, Mr. Ross. Thank you, your honors. I think you hit the nail on the head. It's like saying they only tried to steal a little bit. Continental, my opponent, keeps focusing on this two cents that it's peanuts. Well, apparently it wasn't peanuts to It was worth repudiating this contract over. And so to say it's peanuts is really couldn't be further from the truth. Mr. Elliott really wants to focus on the fact that Chuck Chaffee says, well, it was peanuts. But in the record, Chuck Chaffee also says we were being extorted for two cents a pound. And when you look at two cents a pound, maybe in a vacuum, maybe that sounds like peanuts. But over the life of the contract, which was another three and a half years, that's not peanuts. At 1.8 million pounds a year, that's an additional $36,000 a year. At 2.6 million pounds, which was the amount of carbon black that Continental sold BRC the year before, it's over 50,000 pounds. So the district court concluded that that was quite simply far more than peanuts. And I believe that determination was reasonable. I want to also focus on the standard for it's the black letter law, that it's positive, that it's absolute, it's unconditional. Well, the law also says that assessing the adequacy of Continental's assurances requires a consideration of the specific factual and commercial context of the industry, the parties and the market at the time. And again, considering the adequacy of the assurance requires a consideration of the specific facts. This court has also held back in 1895, C.L. Maddox, Inc. versus Coalfield Services, 51 F. 3rd, 76. This court recognized that an anticipatory breach occurs only when a party makes a clear and unequivocal statement of his intention to break the contract. When his performance comes due, a statement, quote, sufficiently positive to be reasonably understood as meaning that the breach will occur. So there it is. There's a reasonable element in assessing whether or not positive, absolute, and unconditional. And that makes sense because if you're going to look at the specific facts of the occurrence, which is really what the district court here did and what the standard is, then there's going to be a reasonableness element because what is reasonable in one context might not be reasonable in other contexts. I think comment four to the Indiana version of the Uniform Commercial Code is enlightening because it gives an example where, say, someone, a merchant, delivers goods and the goods are defective. And the merchant says, I promise that we're going to cure, I promise that we're going to remedy those defects. Now, in one scenario, a court can say, and the comment recognizes this, well, that's adequate assurances. But then it gives another example where but the same promise by a known corner cutter or a known cost cutter is no longer adequate assurances, no longer adequate assurances unless there was a guarantee or a bond that comes into play. So you're always looking at this through the lens of the parties at the time. And what is reasonableness, what is reasonable, really requires a consideration of what came before the demand. I mean, comment four is saying, not only do we consider what occurred in the immediate lead-up to the demand for assurances, it's saying historical knowledge comes into view. The comment four says, if you have knowledge that this merchant is a known corner cutter, that that can play into the analysis. So what the comment is really saying is that you really consider everything, not just what they've done in the immediate lead-up, but everything you know about this particular merchant. When I view this case, Your Honor, when I submit to, I would submit to this court, is that my opponent has failed to demonstrate that the court incorrectly applied the law or incorrectly recited the facts. And that's, that's important because we're talking about clear error. The only, the only argument... Excuse me, Mr. Ross. On that point, could you address the attack on Mr. Nunley's testimony concerning whether he was instructed in late April to cut BRC off if it would not agree to the two-cent price increase? Yes, Your Honor. Yes, he was instructed to cut off BRC and he he communicated to BRC that he was told... He testified to that, but he also testified on cross that that wasn't quite correct, was it? And then we also have the issue of Mr. Scott's testimony. What are we to make out of all that that testimony on this point where obviously an explicit instruction communicated to to BRC that agree to this or we're going to cut you off? Sure, looks pretty bad for Continental, but what do we make of that cross-examination testimony?  When a witness makes different statements, that is the essence of what the district court is doing. They're assessing the credibility of the witness. I would also add to that point, and this is a point that my opponents made. I don't believe Mr. Nunley told BRC at the time that MOSIA hadn't specifically instructed him to move ahead with the price increase. But, and this is undisputed, Mr. Nunley did communicate to BRC that I am to refrain from speaking to you and that if you initiate legal action we will withhold slash delay shipment. That is undisputed and that was communicated to BRC and that was one of the communications that BRC considered in assessing whether or not they had adequate assurances. And it's one of the communications that the district court considered in assessing whether or not that Continental gave BRC grounds for insecurity and whether or not it had adequate assurances. And that leads me to my next point. The only error, true error that my opponent alleges is that the district court should not have considered what came before the demand in assessing whether or not the repudiation was adequate. I would submit that had the court not considered what came before the demand, that would have been clear error because had the court not considered what came before the demand it would have failed to consider the specific facts and it would have failed to consider the context against which to judge the adequacy of the assurance. Viewing assurances in a vacuum doesn't tell us anything. I believe there's another Seventh Circuit case, I think it's C.L. Maddox, where this court said silence in the face of a demand can be positive, absolute, and unconditional. Well, in a vacuum, in the abstract, I would submit that there's nothing more ambiguous than silence but certainly this court has recognized that at least in one scenario silence can be positive, absolute, and unconditional. So you have to consider what came before and if the court didn't do that it would have deviated from the legal standard. I'd also like to point out a real good jumping off point in evaluating this case is the prior appeal, the prior appeal in 2018 because the primary issue before the court then was whether or not BRC could proceed on this alternative legal theory but towards the end of the appeal this court addressed Continental's request to enter summary judgment and to determine as a matter of law whether or not Continental repudiated and this court said we conclude that Continental repudiated the agreement. This court went on to say whether its allegations add up to positive, absolute, and unconditional is a question for properly reserved for the trier of fact and what I'd really like to point out is this quote by the court it said the party's divergent characterizations of the facts in their briefs illustrate just how differently reasonable fact finders might interpret the record and so I would submit to the court that it's already been determined this is the case the court has determined that a reasonable fact finder could reach this outcome now the court was unwilling to do that based on the paper record but since then the district court applied the legal standard that this court recited in the 2018 opinion this court recognized that whether or not a party has reputed is a determination that must be based on specific facts of the occurrence so this court set out the legal standard it said that ultimately this outcome was reasonable the district court followed that analysis weighed the evidence listened to the testimony of all the witnesses and reached that outcome I would argue your honor that effectively precludes a finding of clear error it's like a probable cause determination in a state law criminal case absent of showing a fraud you can't go back and say oh there was no probable cause except this is even stronger because the probable cause determination didn't come from a trial court it came from an appellate court and that's how I would analogize the situation I also want to point out Judge Hamilton you pointed out the fact that the May 20th email from Gutshall is a positive fact I would say that's one of the very few positive facts and my opponent grossly overstates its importance to this case because at 1 28 p.m on May 20th 2011 Mr. Mosia told Mr. Cornwall I suggest you call another supplier at 409 Mr. Gutshall says confirmed and my opponent is correct at that point Mr. Cornwall testified we were relieved we thought we had assurances but we only had assurances for 51 minutes because at 4 53 p.m on May the 20th Mr. Mosia Mr. Cornwall emails Mr. Mosia back because just because his attorney says one thing we all know our clients don't always listen to us and so he emails Mr. Mosia and he says please confirm you will ship three rail cars next week that was at 4 53 p.m at 5 p.m on the dot Mr. Mosia says we'll do our best regarding one rail car and the evidence in the record was that Mr. Cornwall testified that was entirely unacceptable now after that point the only communications we received from Mr. Mosia were the we'll do our best we'll do our best regarding 1.8 million pounds and then eventually we get the price sheet on May the 31st for June which includes the two cent price increase which my opponent says well we need to inquire further that it was unreasonable for us not to inquire further maybe it was a mistake why on earth would we believe it was a mistake when that when that June pricing brings us back square one six weeks earlier where we started on April 14th that was Continental telling us it's our way or the highway and so that was the final nail in the straw but I also want to add that there are a couple of other very important facts that were learned between May 20th and the May 31st price increase we learned BRC learned from Tom Nunley I believe it was around May 24th we learned that that Continental had budgeted 2.73 million pounds to be shipped to BRC in 2011 we also had knowledge that their annual output was about 600 million pounds a year meaning all of the carbon black that Continental would ship to its various customers BRC was also a tier one customer meaning we got priority because we were a strategic partner because we thought we had a requirements contract we thought we were supposed to buy all of our carbon black from um from Continental and I understand and I'm not making the argument that it's a requirements contract but Mr. Nunley also it was his intent that we buy all of our carbon black from Continental so that made us a tier one customer and so when you hear that we're one of their smallest customers we're a tier one customer they budgeted 2.73 million pounds and now they're telling us we'll do our best to supply only 1.8 million and yes they said a shipment was coming in late May a partially fulfilled shipment but I would argue that's a bad fact for Continental because again it's a partially fulfilled shipment if it was all if it was a fully fulfilled shipment that would be a very good fact for Continental but it was partially fulfilled so I would submit your honors when you view this case when you look at the totality of the circumstances when you look at the what this court said was a very fact specific and very context specific inquiry the district court did not commit clear error and I think it's important to look at the clear error standard because in looking at the clear error standard the issue is did the district court get it clearly wrong the issue is is the district court's account of the evidence plausible in light of the record viewed in its entirety yes your honor Mr. Ross could I ask you um whether um you can direct us to precedents regarding in essence the aftermath of what looks like a satisfactory assurance under 2609 your honor I've not seen any case law a specific case that shows what happens when are you talking about when you go to cover are you talking about no no not cover about whether about the kind of problem we have here with with an assurance and other circumstances I think the the defense referred to it as the noise and confusion at the time but but and I just wonder I assume you all have looked and haven't been able to find it but just wanted to confirm that I I understand the question your honor I think you're directing back to Mr. Elliott's statement that they negated whether or not you could negate the assurance so they say confirmed does anything after that have any meaning uh yes because you have to look at the entire the totality of the circumstances I understand that I understand that argument and its source I'm just wondering if there is case law with more specific application to similar sorts of facts and I'm not aware of that your honor I think part of the issue is these cases are by their very nature so fact specific so very fact specific okay but I did want to touch on the the clear error standard because I do believe it is a high burden that my opponent has to show it's not just whether or not this court disagrees with the outcomes whether the outcome was plausible in light of the record the way I view it I guess in layman's terms is can you follow the trail of evidence does it logically lead to this outcome maybe it could lead to more than one outcome that's kind of what this court was saying in 2018 is divergent characterizations of the evidence reasonable fact finders could reach at least on paper reasonable fact finders could come to different conclusions but in this case the facts are there that can lead the court to the district court's outcome it even referred to this court even referred in 2018 that the allegations we alleged the mosaic was the word the mosaic of allegations was plausible and so the only issue was whether or not the district court would be so persuaded by that evidence and it was so persuaded it weighed the evidence that it correctly applied the law and it reached this outcome it did not commit clear error Mr. Ross what does the evidence tell us about the issue that the defense emphasizes regarding in essence BRC's need to have just one supplier of carbon black to assure consistency of of its of the quality of its product is that you're on that certainly weighs in favor of a view that price was being used as a pretext here to terminate when when you were being told that you didn't have a right to volume that you didn't have a right to well i think price was absolutely a pretext when you look at continental continentals in the market of supplying carbon black this is their business um they're the market maker and so to say that they're suddenly caught off guard by a price fluctuation or a market fluctuation is somewhat suspicious and what's most suspicious is if if it's a really a matter of been we're going to have to raise the price it should have been we're going to have to cut the quantity requirement because what in essence they're saying is it's available but it's available at two cents higher price and ultimately we do know it was available because this may not be relevant to the repudiation issue but when it comes to the failure to mitigate in august of 2011 a mere three months later Mr. Huntley comes to BRC's headquarters in cherubusco indiana and says i'd like to sell you 2.9 million a year well 2.9 million a year three months ago you told us you didn't know that you could meet 1.8 million a year so the whole way this dispute started is suspicious and the district court explicitly made a credibility determination and said i am persuaded that this was a ploy this was leverage this was this was continental trying to get a better price and this isn't really unheard of by a 20 years ago california was having an energy crisis not unlike it is now there were rolling blackouts the power companies were trying to get a better price governor gray davis ended up caving and agreed to a contract with much higher prices i think he got recalled because of it afterwards investigations were done into that issue and found that the five largest utilities were withholding power and actually could have supplied enough power so in essence what the utilities were doing is what continental is doing today they said oh it's available at two cents a pound higher i'd briefly like to talk about the the element that's whether or not continental's breach substantially impaired the value as a whole your time's about to expire you've got about a half a minute uh briefly your honor the court found that that continental's breach substantially impaired the value as a whole i believe that is a very straightforward issue because the price increase was not limited to just one shipment it wasn't limited to just shipments in june 2011 or may 2011 the price increase was to affect every shipment for the next three and a half years and so the existence of such non-conformity depends on the facts and circumstances of each case that's the standard for assessing a substantial impairment of the value of the contract as a whole the court made another reasonableness determination it did not commit clear error in reaching that conclusion thank you your honors i appreciate your time thank you mr boss mr elliott you got thank you your honor about three minutes on that last point uh the price sheet that would the price sheet that was issued was a june price sheet for the month of june so contrary to what mr ross just said it did not apply for the rest of the contract on the issue of mr nunley's testimony i don't think there's any way they can rely on it because he did not tell the truth the first time around and he was reigned back in yet yet that version is also corroborated by mr scott correct i don't think so your honor not in the way that mr nunley said it there's also the point that mr chafee said testified that they didn't rely on anything that mr nunley said to them in connection with terminating the agreement and that would apply also to that information that mr uh ross just described as brc having learned on or about may 24th that is what the volume projections were by continental for brc i'm looking at deposition testimony pages 61 62 did mr mosiah direct you as to how to handle customers that rejected the price increase request answer other than if they don't want it somebody else will take it you know questions so the customers were made aware that if they didn't agree to the price increase that they wouldn't receive carbon black answer if they didn't want it don't place the order we've got a home for it so that was the general way we took the price announcement out there none of that information was before brc when they made any decisions in this case right but it's consistent with nunley's first his direct testimony right i suppose it is your honor but uh the fact is he retreated from that testimony on cross for a good reason um he had to be i guess in the end my perspective on this is i understand why brc is focusing on all the things that happened before may 20 that support their case because really the only thing that happened after may 20 that supports their case is the sending of the price sheet and in my view if you look at this standard positive absolute unconditional which requires some level of clarity you've got a unambiguous provision of adequate assurance you've got a partial order shipped you got a promise of another order shipped you've got someone saying we're available for questions all that lined up against and you also have brc subjective understanding that they're going to get 1.8 million pounds all that lined up against the mere sending of the price sheet in my view does not come close to unconditional repudiation thank you counsel thanks to both counsel and the case will be taken under advice